**IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, STATE OF MISSOURI**
**TWENTY-FIRST DIVISION**
**CIRCUIT COURT**          2007 APR 30  AM 10: 51

                                              ꞏꞏ ꞏ  CLERK

|                                      |     |                          |
|--------------------------------------|-----|--------------------------|
| OSMOTECH, LLC,                       | )   |                          |
| a Georgia limited                    | )   |                          |
| liability company,                   | )   |                          |
|           Plaintiff,                 | )   |                          |
|                                      | )   |                          |
| vs.                                  | )   | CASE NO. 07CC-001373     |
|                                      | )   | Division        11       |
|                                      | )   |                          |
| SPACE HARDWARE OPTIMIZATION          | )   |                          |
| TECHNOLOGY, INC.,                    | )   |                          |
| an Indiana corporation,              | )   |                          |
|           Defendant.                 | )   |                          |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of Plaintiff's First Request for Production of Documents and Interrogatories Directed to Defendant as well as a computer diskette in Microsoft Word Windows XP have been served upon William M. Corrigan, Jr. at One Metropolitan Square, Suite 2600 St. Louis, MO 63102-2740 by depositing same in the U.S. Mail, postage prepaid, this 27th day of April, 2007.

GLEN GAMMILL                    41641
Attorney for Plaintiff
2025 S. Brentwood Blvd., Ste. 10
St. Louis, MO 63144
(314) 968-6890
(314) 962-7778 Facsimile

# IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

OSMOTECH LLC

PLAINTIFF

vs

SPACE HARDWARE OPTIMIZATION TECHNOLOGY I

DEFENDANT

07CC-001373 B CV

CASE NUMBER

## S U M M O N S   F O R   S E R V I C E   O U T S I D E   T H E   S T A T E

THE STATE OF MISSOURI TO:   DEFENDANT   (1)

SPACE HARDWARE OPTIMIZATION TECHNOL
MARK S DEUSER - SRV
PRESIDENT
7200 HIGHWAY 150
GREENVILLE IN 47124

YOU ARE SUMMONED TO APPEAR BEFORE THIS COURT AND TO FILE YOUR PLEADING TO
THE PETITION, COPY OF WHICH IS ATTACHED, AND TO SERVE A COPY OF YOUR PLEADING
UPON THE ATTORNEY OR PARTY WHOSE NAME AND ADDRESS IS LISTED BELOW ALL WITHIN
30 DAYS AFTER SERVICE OF THIS SUMMONS UPON YOU, EXCLUSIVE OF THE DAY OF
SERVICE. IF YOU FAIL TO FILE YOUR PLEADING, JUDGMENT BY DEFAULT MAY BE TAKEN
AGAINST YOU FOR THE RELIEF DEMANDED IN THE PETITON.

*******SPECIAL NEEDS PHONE NUMBERS CHANGE EFFECTIVE 9-13-99 AS FOLLOWS********
CIRCUIT CLERK'S OFFICE 314/615-8029; FAX 314/615-8739; TTY 314/615-4567

DATE ISSUED  APRIL 2, 2007

ATTORNEY:

GLEN SHILLING GAMMILL
SUITE 10
2025 S BRENTWOOD BLVD
ST LOUIS MO 63144
(314) 968-6890



**JOAN M. GILMER,** Circuit Clerk

By _____
   Deputy Clerk

**SPECIAL NEEDS: If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314/615-8029, FAX 314/615-8739, or TTY at 314/615-4567, at least three business days in advance of the court proceeding.**

WHITE - Sheriff's Return                    YELLOW - Service Copy                    PINK - Court File

## DIRECTIONS TO OFFICER MAKING RETURN .. SERVICE

A copy of the summons and a copy of the petition must be served on each Defendant. If a court date is stated in the summons, a copy of the summons and a copy of the petition must be served on each Defendant at least ten days before that date. If any Defendant refuses to receive the copy of the summons and petition when offered to him, the return shall be prepared accordingly so as to show the offer of the officer to deliver the summons and petition and the Defendant's refusal to receive the same.

Service shall be made as follows: (1) On individual. Upon an individual, including an infant or incompetent person not having a legally appointed guardian, by delivering a copy of the summons and petition to him personally or by leaving a copy of the summons and petition at his dwelling house or usual place of abode with some person of his family over 15 years of age, or by delivering a copy of the summons and petition to an agent authorized by appointment or required by law to receive service of process; (2) On Guardian. Upon an infant or incompetent person who has a legally appointed guardian, by delivering a copy of the summons and petition to the guardian personally; (3) On Corporation, Partnership or Other Unincorporated Association. Upon a corporation, partnership or unincorporated association, by delivering a copy of the summons and petition to an officer, partner or managing or general agent, or by leaving the copies at any business office of the Defendant with the person having charge thereof or by delivering copies to its registered agent or to any other agent authorized by appointment or required by law to receive service of process; (4) On Public or Quasi-Public Corporation or Body. Upon a public, municipal, governmental or quasi-public corporation or body, by delivering a copy of the summons and petition to the clerk of the county governing body in the case of a county, to the mayor or city clerk or city attorney in the case of a city, to the chief executive officer in the case of any public, municipal, governmental, or quasi-public corporation or body or to any person otherwise lawfully so designated.

Service may be made by an officer or deputy authorized by law to serve process in Civil actions within the state or territory where such service is made.

Service may be made in any state or territory of the United States. If served in a territory, substitute the word "territory" for the word "state". The officer making the service must swear an affidavit before the clerk, deputy clerk, or judge of the court of which he is an officer or other person authorized to administer oaths. This affidavit must state the time, place, and manner of service, the official character of the affiant, and the affiant's authority to serve process in civil actions within the state or territory where service is made.

The return should be made promptly, and in any event so that it will reach the Missouri court prior to the court date stated in this summons or, if no court date is stated in this summons, so that it will reach the Missouri Court within 30 days after service.

## OFFICER'S AFFIDAVIT OF SERVICE

I hereby swear or affirm that I served the within summons on the _13_ day of _april_ , 200 _7_ .

1) By delivering a copy of the summons and petition to the within named _____ personally; or

2) By leaving a copy of the summons and petition for the within named _Vice President - John Uellinger_ at his or her dwelling house or usual place of abode with some person of his or her family over the age of 15 years; or

3) _____

All within the County of _Floyd_

State or Territory of _Indiana_ and I am a(n) _Civil Process Server_
(OFFICIAL TITLE)

and, as such, authorized to serve process in civil actions within said state or territory.

Officers fees:

Summons _____

Non Est _____

Mileage _____

Total _____

Signature

_C.W. Smithson Civil Process Server_
Name and Official Title

On this _13th_ day of _April_ , 200 _7_ , before me personally appeared

_C.W. Smithson Process Server for Floyd Cail_
(NAME OF PERSON)          (OFFICIAL TITLE)

known by me to be the person who executed the foregoing affidavit, and acknowledged to me that (s)he executed the same for the purpose therein stated.

Witness my hand and seal,

SIGNATURE   5/22/09

STATE OF _Indiana_

COUNTY OF _Floyd_

Title (must be clerk or judge of court which affiant is an officer or other person authorized to administer oaths in such state)

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

OSMOTECH, LLC,                               )          APR 25  PM 4: 02
                                             )
          Plaintiff,                         )
                                             )          Cause No: 07CC-001373
vs.                                          )
                                             )          Division No. 11
SPACE HARDWARE OPTIMIZATION                  )
TECHNOLOGY, INC.,                            )
                                             )
          Defendant.                         )

## ENTRY OF APPEARANCE

COME NOW William M. Corrigan, Jr., Jeffrey L. Schultz, and the law firm of

Armstrong Teasdale, LLP, and hereby enter their appearance on behalf of defendant Space

Hardware Optimization Technology, Inc.

ARMSTRONG TEASDALE LLP

BY:

William M. Corrigan, Jr.                    #33169
Jeffrey L. Schultz                          #56553
One Metropolitan Square, Suite 2600
St. Louis, Missouri 63102-2740
(314) 621-5070
(314) 621-5065 (facsimile)
wcorrigan@armstrongteasdale.com
jschultz@armstrongteasdale.com

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing documents was

sent via first class mail, postage prepaid, on this 25th day of April, 2007 to the following:

Glen Gammill
2025 Brentwood Blvd., Ste 10
St. Louis, Missouri 63144
*Attorney for Plaintiff*

# In the
# CIRCUIT COURT
## of St. Louis County, Missouri

This Circuit Civil/Equity Cover Sheet and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form is required by the Clerk of this Court for the purpose of initiating case processing. (See instructions below.)



For File Stamp Only

Case Number: 001373

Division: 11

## Circuit Civil/Equity Cover Sheet

| 1. PLAINTIFF(S) | DEFENDANT(S) |
|---|---|
| Osmatech, LLC | Space Hardware Optimization Technology, Inc. |

| First Plaintiff's: | First Defendant's: |
|---|---|
| (b) Address 17295 Chesterfield Airport Rd Chesterfield MO 63017 | (b) Address 7200 Highway 150 Greenville, IN 47124 |
| Telephone (636) 346-7379 | Telephone _____ |
| (c) Attorney Glen Gammill | (c) Attorney _____ |
| Bar # 41641 | Bar # _____ |
| Firm 2025 S. Brentwood 10 | Firm _____ |
| Address St. Louis, MO 63144 | Address _____ |
| Telephone (314) 968-6890 | Telephone _____ |
| Fax # (314) 962-7778 | Fax # _____ |

## 2. NATURE OF ACTION CODE (PLACE AN "X" IN ONLY ONE BOX)

**CIVIL**
- ☐ 10100 PERSONAL INJURY VEHICULAR
- ☐ 10200 PERSONAL INJURY PRODUCT LIA.
- ☐ 10300 PERSONAL INJURY MALPRACTICE
- ☐ 10400 PERSONAL INJURY OTHER
- ☐ 11000 PROPERTY DAMAGE
- ☐ 11100 WRONGFUL DEATH
- ☐ 11900 TORT – OTHER
- ☐ 11910 INTENTIONAL TORT
- ☒ 20100 SUIT ON CONTRACT
- ☐ 20101 AGREEMENT
- ☐ 20105 ACCOUNT
- ☐ 20110 NOTE

- ☐ 40100 SUIT- ENFORCE MECHANIC'S LIEN
- ☐ 40200 EMINENT DOMAIN – STATE
- ☐ 40210 EMINENT DOMAIN – COUNTY
- ☐ 40220 EMINENT DOMAIN – OTHER
- ☐ 40230 EXCEPTION
- ☐ 70100 REG OF FOREIGN JUDGMENT–CV
- ☐ 70200 TAX ACTION
- ☐ 70400 SMALL CLAIMS TRIAL DE NOVO
- ☐ 70500 POST-CONV RELIEF–RULE 24.035
- ☐ 70505 POST-CONV RELIEF–RULE 29.15
- ☐ 71900 MISC. – CV
- ☐ 71920 REPLEVIN
- ☐ 71925 WILL CONTEST
- ☐ 71935 PRO FORMA DECREE
- ☐ 71971 TRIAL DE NOVO FROM ASSOC DIV
- ☐ 71999 MISC. CV-SUBPOENA/FOREIGN JUR

**EQUITY**
- ☐ 31900 OTHER ADMINISTRATIVE REVIEW
- ☐ 41900 OTHER REAL ESTATE
- ☐ 41910 FORECLOSURE
- ☐ 41920 QUIET TITLE
- ☐ 41930 EJECTMENT
- ☐ 41940 PARTITION
- ☐ 50100 HABEAS CORPUS
- ☐ 50120 MANDAMUS
- ☐ 50200 INJUNCTION
- ☐ 50210 TEMPORARY RESTRAINING ORDER

- ☐ 50300 DECLARATORY JUDGMENT
- ☐ 51900 OTHER EXTRAORDINARY REMEDY
- ☐ 51910 PROHIBITION
- ☐ 70600 EXPUNGEMENT- ARREST RECORD
- ☐ 71910 FORFEITURE
- ☐ 71915 INTERNAL AFFAIRS OF TRUST (PROBATE - DIV)
- ☐ 71930 SPECIFIC PERFORMANCE
- ☐ 71940 MISC – EQ
- ☐ 71950 WRIT OF CERTIORARI
- ☐ 71977 MISC EQ-STUDENT TRIAL DE NOVO

Signature of Person Filing: _____

## Instructions for Completing Circuit Civil/Equity Cover Sheet

As part of our reporting requirements to the Missouri Supreme Court and the Office of the State Courts Administrator you are required to complete and submit this Circuit Civil/Equity Cover Sheet at the time you file your cause of action. Your cause of action will not be accepted and/or processed unless it is accompanied by this Circuit Civil/Equity Cover Sheet at the time of filing. The person, or attorney, filing the cause of action should complete the form as follows:

1. Plaintiff(s)/Defendant(s): Enter the names (last, first, middle initial) of plaintiff(s) and defendant(s). If the plaintiff or defendant is a:
   Corporation – Include the name of the registered agent or corporate officer.
   Government Agency – Use only the full name or standard abbreviations.
   Government Official – Identify the Agency and then the official, giving both title and name.
   If all the parties' names cannot fit on this form, list them on an attachment, noting in this section "see attachment."
   (b) Address   Enter the address, telephone number, of the first plaintiff and defendant, include zip code.
   (c) Attorneys  Enter the firm name, address, zip code, telephone & fax number, and bar number(s) of the attorney(s) of record. If there are several attorneys, list them on an attachment, noting in this section "see attachment."
2. Nature of Action. Place an "x" in the one appropriate box which corresponds to the type of action you are filing.
3. **NOTE: If there are multiple counts in the petition that are considered both Civil and Equity, it is the responsibility of the filing party to choose the one appropriate nature of action. The assignment of the case is subject to review by the Presiding Judge. Based on a review, the case may be reassigned.**

**IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, STATE OF MISSOURI**
**TWENTY-FIRST DIVISION**
**CIRCUIT COURT**

| | |
|---|---|
| **OSMOTECH, LLC,** | ) |
| **a Missouri limited** | ) |
| **liability company,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) CASE NO. |
| | ) Div. |
| | ) |
| **SPACE HARDWARE OPTIMIZATION** | ) |
| **TECHNOLOGY, INC.,** | ) |
| **an Indiana corporation,** | ) |
| **Defendant.** | ) |

Serve at:
Mark S. Deuser
President
SPACE HARDWARE OPTIMIZATION
TECHNOLOGY, INC.
7200 Highway 150,
Greenville, Indiana 47124

**Jury Trial Demanded**

**PETITION FOR BREACH OF CONTRACT; VIOLATION OF MISSOURI**
**UNIFORM TRADE SECRETS ACT; BREACH OF IMPLIED COVENANT OF**
**GOOD FAITH AND FAIR DEALING; FRAUD AND INJUNCTIVE RELIEF**

**NOW COMES Plaintiff, OSMOTECH, LLC,** a Missouri limited

liability company, by its counsel, and complaining of **Defendant,**

**SPACE HARDWARE OPTIMIZATION TECHNOLOGY, INC.,** an Indiana

corporation, states as follows:

1

## COUNT I
## BREACH OF CONTRACT

1.    Plaintiff, OSMOTECH, LLC ("OSMOTECH"), is a Missouri corporation, with its principal place of business at 17295 Chesterfield Airport Rd., Ste. 200, Chesterfield, Missouri. OSMOTECH is engaged in the business of concrete waterproofing, restoration and protection.

2.    Defendant, SPACE HARDWARE OPTIMIZATION TECHNOLOGY, INC. ("SHOT") is an Indiana corporation engaged in the business of project design and production. SHOT's principal place of business is located at 7200 Highway 150, Greenville, Indiana 47124.

3.    At all times relevant hereto, Paul Femmer ("Paul Femmer") has been the President of OSMOTECH.

4.    At all times relevant hereto, Mark S. Deuser ("Deuser") was the President of SHOT.

5.    At all times relevant hereto, Jim Cherry ("Cherry"), the Business Development Manager for SHOT, acted as an agent of SHOT.

6.    At all times relevant hereto, Eric Taylor ("Taylor"), Mechanical Engineer for SHOT, acted as an agent of SHOT.

7.    Plaintiff's principal place of business was located in St. Louis County Missouri at the time Plaintiff was first

2

injured by Defendant, and Venue is therefore proper pursuant to 508.010 R.S.Mo. 1994. Further, Defendant has had sufficient minimum contacts in the state of Missouri, and the County of St. Louis in that the agents of Defendant appeared in St. Louis County, Missouri, and received Proprietary Information which was protected by the Non-Disclosure Agreement as set forth hereinafter.

8.   On or about November 7, 2005, Jim Cherry contacted Femmer requesting a meeting in Greenville, IN to discuss SHOT's theoretical E-Seal electrophoretic surface treatment system ("E-Seal") and "the benefit that Osmotech can bring to the development of the hardware as well as the potential for OsmoTech in being able to utilize this technology to treat the variety of problems we have discussed with concrete and stone structures."

9.   OSMOTECH executed in its offices in St. Louis County the Non-Disclosure Agreement that SHOT had previously executed on November 29, 2005 and sent to OSMOTECH, with an effective date of December 4, 2005 (the "NDA").   A true and correct copy of the Non-Disclosure Agreement is attached hereto as Exhibit "A" and incorporated herein by this reference.

10.   On or about December 5, 2005, Femmer, Erkki Lindberg (an Engineer for OSMOTECH), John Vellinger (Chief Operating

3

Officer and Vice President of SHOT), Paul Todd (Chief Scientist for SHOT), Cherry and Taylor met in the offices of SHOT in Greenville, IN for furtherance of the purposes set forth in paragraph 8 herein.

11. Section 1 of the NDA provides the purpose of the parties entering into the NDA and for the use, handling, protection and safeguarding of the Proprietary Information which is disclosed by and between the parties relating to strategic business plans, teaming opportunities and proprietary technologies.

12. Section 2 of the NDA defines "Proprietary Information" as technical data and other information (including, but not limited to, reports, descriptions, drawings, compositions, business, and financial information and computer software) in whatever form, which is related to strategic business plans, teaming opportunities and proprietary technologies of each party.

13. Section 5.A. of the NDA strictly limits the use and disclosure of Proprietary Information by either party for the purpose(s) of discussing and understanding associated systems development and shall not otherwise be used for the benefit of the receiving party.

4

14. Section 5.B. of the NDA further limits the use and disclosure of Proprietary Information from being copied or reproduced by the receiving party without the express written permission of the disclosing party.

15. Section 5.C. of the NDA further limits the use and disclosure of Proprietary Information only to the director or employees of the receiving party who have a "need to know" in connection with strategic business plans, teaming opportunities and proprietary technologies.

16. Between December 5, 2005 and December 31, 2006, Femmer, Cherry and Taylor personally met in St. Louis, Missouri; Mt. Vernon, Illinois; and Champaign, Illinois and between Femmer, Deuser, Cherry and Taylor and other officers of both companies in Greenville, Indiana for purposes of developing a teaming opportunity between OSMOTECH and SHOT.

17. On or about February 8, 2006 and unbeknownst to OSMOTECH, and without its prior written permission and in breach of the NDA, Eric Taylor and Paul Todd, acting on behalf of SHOT, filed a provisional patent application with the U.S. Patent and Trademark Office ("USPTO") for Electrophoresis Method and Device for Sealing and Strengthening Concrete and a Method for Its Testing, substantially utilizing Proprietary Information,

including trade secrets, that had been disclosed by OSMOTECH to SHOT.

18.  On or about February 10, 2006, 2006 Cherry and Taylor met at the offices of OSMOTECH in St. Louis County, Missouri with Paul Femmer, who was the President of OSMOTECH, to inspect OsmoTech's proprietary devices, methods and trade secrets, and to continue further discussions under the NDA including SHOT's interest in utilizing proprietary technology and trade secrets of OSMOTECH as part of a teaming opportunity as provided for under the NDA. Mark Deuser was aware of the nature and purpose of that meeting.

19.  Between December 5, 2005 and March 5, 2007, the parties have had numerous conversations, correspondence and e-mails concerning various teaming opportunities between the parties.

20.  Consistent with the prior representations and believing the discussions to be confidential and part of SHOT's due diligence prior to making a teaming opportunity offer, Femmer provided Cherry, Taylor, and Deuser with information about OSMOTECH's confidential trade secrets and proprietary technology during these numerous conversations, correspondence and e-mails.

6

21. As part of this teaming opportunity and subject to the NDA, OSMOTECH disclosed Proprietary Information, which included certain trade secrets of OSMOTECH and information concerning its proprietary technologies which included (but is not limited to) the following:

(a) **OSMOTECH's Power Supply** - OSMOTECH disclosed that its electrophoretic system featured a synchronized, multi-applicator (separate applicators running concurrently off one power supply), programmable, polarity-reversing, pulsating, steel protecting, current controlling, voltage controlling, remotely monitored and controlled, commercial-grade DC power supply with multiple feedback circuits, which was specifically developed by OSMOTECH for concurrently treating thousands of square feet of concrete at one time more or less continuously and programmatically over the span of several days for automated deep particle applications such as strengthening, crack fusion, corrosion, alkali-silica reaction, and sulphate attack in bridges, roads, dams, piers, wharfs, runways, bunkers and other types of concrete infrastructure. SHOT disclosed that it was trying to design an E-Seal power supply for very superficial surface applications (e.g., very shallow surface sealing for water intrusion) in relatively modest structures, such as residential basements; using a single, small, sponge applicator,

similar in function to a "paint brush", that is hand-held in one place for a just a few minutes before being moved to the next treatment location;

(b) **OSMOTECH'S Perforated Electrode** – OSMOTECH disclosed that it had developed perforated electrodes for saturating and electrifying soils or other media directly underneath and/or behind concrete structures, and which are designed to be networked and synchronized so as to concurrently treat thousands of square feet of concrete at one time more or less continuously and programmatically over the span of several days for (i) extracting harmful chemicals such as chlorides or sulphates from concrete, (ii) to serve as opposing electrodes to the surface electrodes, and (iii) to provide particle treatments from below and/or behind concrete structures such as roads, retaining walls, slabs and bunkers. SHOT disclosed that it was trying to design a small, sponge applicator (i) to be used by one person for very superficial surface applications (e.g., very shallow surface sealing for water intrusion) in relatively modest structures, such as residential basements; (ii) that is hard-shelled, inflexible, and similar in function to a "paint brush" that is hand-held in one place for just a few minutes before being moved to the next treatment location; and (iii) that was

8

borrowed from a multi-layered sponge applicator design invented by Dr. Henry Cardenas, PhD, of Louisiana Tech University.

(c) **OSMOTECH'S Inflatable Electrode Applicator** - OSMOTECH disclosed that it had developed lightweight, inflatable, fabric electrode applicators of multiple shapes and sizes which are designed to be (i) attached to any shape of concrete surface or structure (e.g., curved bridge columns and water tanks), and (ii) networked and synchronized with up to hundreds of other inflatable applicators so as to concurrently treat thousands of square feet of concrete at one time more or less continuously and programmatically over the span of several days for automated deep particle applications such as strengthening, crack fusion, corrosion, alkali-silica reaction and sulphate attack. SHOT disclosed that it was trying to design a small, sponge applicator (i) to be used by one person for very superficial surface applications (e.g., very shallow surface sealing for water intrusion) in relatively modest structures, such as residential basements; (ii) that is hard-shelled, inflexible, and similar in function to a "paint brush" that is held in one place for just a few minutes before being moved to the next treatment location; and (iii) that was borrowed from a multi-layered sponge applicator design invented by Dr. Henry Cardenas, PhD, of Louisiana Tech University.

9

(d) **OSMOTECH'S Methods and Devices For Strengthening and Rehabilitation** - OSMOTECH disclosed that it had developed and/or licensed from Louisiana Tech University methods and devices for deep migration (up to several inches deep) of particles concurrently across thousands of square feet of concrete at one time more or less continuously over the span of several days to strengthen and rehabilitate damaged or otherwise low-performance concrete such as degraded bridge decks, locks and dams, seawalls, and bunkers. SHOT disclosed that it was trying to design only a device (not a method) for very superficial surface applications (e.g., very shallow surface sealing for water intrusion) in relatively modest structures, such as residential basements; using a single, small, sponge applicator, similar in function to a "paint brush", that is hand-held in one place for a just a few minutes before being moved to the next treatment location;

(e) **OSMOTECH'S Methods and Devices For Alkali-Silica Reaction ("ASR")** - OSMOTECH disclosed that it had developed methods and devices for deep migration (up to several feet deep) of particles concurrently across thousands of square feet of concrete at one time more or less continuously and programmatically over the span of several days to mitigate and prevent ASR expansion in structures such as roads, bridges and

10

dams. SHOT disclosed that it was trying to design only a device (not a method) for very superficial surface applications (e.g., very shallow surface sealing for water intrusion) in relatively modest structures, such as residential basements; using a single, small, sponge applicator, similar in function to a "paint brush", that is hand-held in one place for a just a few minutes before being moved to the next treatment location;

(f) **OSMOTECH'S Methods and Devices For Rebar Corrosion** – OSMOTECH disclosed that it had developed and/or licensed from Louisiana Tech University methods and devices for deep migration (up to several inches deep) of particles concurrently across thousands of square feet of concrete at one time more or less continuously and programmatically over the span of several days to (i) extract chlorides away from the rebar (using a proprietary form of electro-chemical chloride extraction); while (ii) simultaneously transporting and directing particles to where they are needed to create permeability and chemical barriers against chloride re-entry and corrosion of steel reinforcement in bridges and other steel reinforced structures. SHOT disclosed that it was trying to design only a device (not a method) for very superficial surface applications (e.g., very shallow surface sealing for water intrusion) in relatively modest structures, such as residential basements; using a

11

single, small, sponge applicator, similar in function to a "paint brush", that is hand-held in one place for a just a few minutes before being moved to the next treatment location;

(g) **OSMOTECH'S Methods and Devices For Polymer Impregnation** – OSMOTECH disclosed that it and Louisiana Tech University had developed methods and devices for deep migration (up to several inches deep) and self-assembly of charged latex particles concurrently across thousands of square feet at one time more or less continuously and programmatically over the span of several days, and featuring OSMOTECH's patented Electro-Osmotic Pulse ("EOP") dewatering system to (i) pre-dry the concrete before treatment and (b) to cause polymer self-assembly after treatment. SHOT disclosed that it was trying to design only a device (not a method) for very superficial surface applications (e.g., very shallow surface sealing for water intrusion) in relatively modest structures, such as residential basements; using a single, small, sponge applicator, similar in function to a "paint brush", that is hand-held in one place for a just a few minutes before being moved to the next treatment location. However, SHOT did eventually disclose, several months after OSMOTECH'S initial polymer impregnation disclosure, that SHOT had previously "considered use of", or words to that effect,

12

polymer spheres for superficial surface treatments, but with no consideration whatsoever of OSMOTECH'S EOP dewatering process;

(h) **OSMOTECH'S Methods and Devices For Crack Repair** – OSMOTECH disclosed that it and Louisiana Tech University had developed methods and devices to monolithically fuse cracks, seams and joints by inserting a flexible "U"-shaped mesh electrode deep (at least one-half to two inches deep) along the inner walls of a crack, seam or joint; filling the crack, seam or joint with special grout admixtures; and drawing particles directly to the deeply embedded electrode mesh concurrently along the entire crack, seam or joint more or less continuously and programmatically over the span of several days. SHOT disclosed that it had previously overlooked or otherwise not considered the need for methods or devices to fuse cracks, seams or joints.

(i) **OSMOTECH'S Methods and Devices For One-Sided Applications** – OSMOTECH disclosed that it, Louisiana Tech University, and the US Army Corps of Engineers had developed methods and devices to cause deep migration (up to several inches deep) of particles into concrete from only one side of the structure based on a "caterpillar" process of alternating fields. SHOT disclosed that it had previously not considered

13

the need for methods or devices to treat structures from only one side.

22. SHOT has disclosed to third parties without the prior written consent of OSMOTECH and in breach of the NDA the proprietary technologies and trade secrets set forth in paragraph 21 disclosed by OSMTOECH to SHOT.

23. SHOT has taken OSMOTECH's Proprietary Information and trade secrets, without the prior written consent of OSMOTECH and in breach of the NDA, and has disclosed to third parties this information for purposes of obtaining governmental contracts, grants and funding for itself related to research and development utilizing OSMOTECH's proprietary technology and trade secrets.

24. SHOT has attempted to incorporate into and claim as its own proprietary technology, the proprietary technologies and trade secrets set forth in paragraph 21 disclosed by OSMTOECH to SHOT.

25. Although OSMOTECH reasonably believed that a teaming opportunity was forthcoming with SHOT, none was ever made.

26. On or about January 9, 2007, OSMOTECH learned that SHOT had utilized its contacts with OSMOTECH, and under the guise of a teaming opportunity with OSMOTECH, had been soliciting certain government agencies using this teaming

14

opportunity to obtain further government funding and contracts, knowing that (a) such a teaming opportunity had not been reached between the parties, and (b) that SHOT was seeking said government funding and contracts to redevelop technology that was already developed and owned by OSMOTECH as a proprietary technology or trade secret.

27. On or about March 9, 2007, SHOT, through its employees or agents, filed a patent application with the USPTO based, at least in part, on OSMOTECH's proprietary technology and trade secrets described in paragraph 21 above and disclosed to SHOT under the NDA.

28. On March 8, 2007, OSMOTECH advised SHOT in writing to cease and desist with the practices and disclosures set forth above. In a letter Dated March 14, 2007 from an attorney representing SHOT, a true and correct copy of such letter is attached hereto as Exhibit "B" and incorporated herein by this reference, SHOT has refused to comply with same and has advised OSMOTECH that "SHOT has never received any information from you, OsmoTech . . . that is within the definition of "Proprietary Information" in Article 2 of the December 4, 2005 Non-Disclosure Agreement. . . Consequently, SHOT has never been in the position to misappropriate OsmoTech's Proprietary Information, as you assert in Your Letter(.)"

15

29. SHOT breached the NDA to treat the information provided to it by OSMOTECH as confidential and not to use the information for any purposes other than discussing teaming opportunities between the parties.

30. SHOT is systematically using the information which it received on a confidential basis to unfairly compete with OSMOTECH and to destroy the good will and customer relationships that OSMOTECH has developed.

31. As a result of SHOT's use of OSMOTECH's confidential information, including Proprietary Information and trade secrets, OSMOTECH has been damaged in an amount in excess of $75,000.

**WHEREFORE**, Plaintiff prays that Judgment be entered in favor of Plaintiff OSMOTECH, LLC and against Defendant SPACE HARDWARE OPTIMIZATION TECHNOLOGY, INC., in an amount to be proven at trial.

## COUNT II
## REQUEST FOR INJUNCTIVE RELIEF

32. Plaintiff adopts and re-alleges Paragraphs 1 through 35 of this Petition as if fully set forth herein.

16

33. OSMOTECH has a proprietary interest in its confidential proprietary technologies, trade secrets and Proprietary Information. If SHOT is permitted to continue to use OSMOTECH's confidential information, OSMOTECH will continue to be damaged.

34. OSMOTECH has requested that SHOT cease and desist from using OSMOTECH's confidential information, but SHOT has failed or refused to do so.

35. OSMOTECH has suffered and will continue to suffer irreparable harm and injury as a result of SHOT's systematic use of OSMOTECH's confidential information.

36. OSMOTECH has a likelihood of success on the merits.

37. OSMOTECH has no adequate remedy at law.

38. The NDA provides that each party shall have the right to obtain preliminary and permanent injunctive relief to secure specific performance, and to prevent a breach or contemplated breach of the NDA.

**WHEREFORE**, Plaintiff prays that it be granted preliminary and permanent injunctive relief, enjoining Defendant from utilizing OSMOTECH's confidential information including its proprietary technology and trade secrets.

## COUNT III
### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

17

39. Plaintiff adopts and re-alleges Paragraphs 1 through 38 of this Petition as if fully set forth herein.

40. Defendant had a duty to exercise judgment conferred by the express terms of the above-referenced agreements in such a manner so as to not evade the spirit of the transaction or deny Plaintiff the expected benefit of the NDA.

41. Defendant breached that duty by engaging in bad faith and/or unfair dealing.

42. Plaintiff was thereby damaged.

**WHEREFORE**, Plaintiff prays judgment against Defendant in an amount which will be proved at trial, together with attorneys' fees, costs, and for such further relief as the Court shall deem just and proper.

### COUNT IV
### Fraud

43. Plaintiff adopts and re-alleges Paragraphs 1 through 42 of this Petition as if fully set forth herein.

44. After December 4, 2005, OSMOTECH disclosed to SHOT that OSMOTECH was seeking to waterproof, strengthen, and otherwise rehabilitate degraded U.S. Army ammunition bunkers , and that, in accordance with a request from Mr. Vince Hock of

the U.S. Army Corps of Engineers, OSMOTECH would be seeking a congressional earmark for federal funding to waterproof, strengthen and otherwise rehabilitate bunkers for the U.S. military using the technology set forth in paragraph 21.

45. SHOT represented to OSMOTECH that they had a great deal of experience in drafting the documents necessary to obtain such government funding.

46. SHOT represented to OSMOTECH that they would draft the necessary documents to apply for said government funding in the amount of one to four million dollars as a joint teaming opportunity involving both SHOT and OSMOTECH.

47. SHOT represented to OSMOTECH that OSMOTECH would do the actual project using OSMOTECH's trade secrets, ideas, designs, methods, plans and technology set forth in paragraph 21, and that SHOT would manufacture the devices necessary for the project.

48. Based on the material false representations of SHOT, and relying on said representations to be true, OSMOTECH disclosed to SHOT the trade secrets, ideas, designs, methods, plans and technology set forth in paragraph 21 to complete said waterproofing, strengthening and rehabilitation project for the purpose of obtaining said government funding.

49. Said false representations of SHOT were material to OSMOTECH in that OSMOTECH would not have disclosed to SHOT its trade secrets, ideas, designs, methods, and plans to waterproof, strengthen and otherwise rehabilitate said structures using the technology set forth in paragraph 21 but for the false representations of SHOT.

50. Based on the material false representations of SHOT, and relying on said representations to be true, OSMOTECH did not seek and/or apply for said government funding in its own name.

51. Said false representations were material to OSMOTECH in that OSMOTECH would have applied for said government funding in its own name but for the false representations by SHOT.

52. The aforesaid material representations made by SHOT to OSMOTECH were false, and defendant knew of their falsity.

53. OSMOTECH did not know of the falsity of said material representations made by SHOT.

54. OSMOTECH had the right to rely on said representations made by SHOT, inasmuch as said waterproofing, strengthening and rehabilitation project was based solely on the trade secrets, ideas, designs, methods, plans and technology of OSMOTECH set forth in paragraph 21, and disclosed to SHOT under the protection of the NDA.

20

55. SHOT intended and reasonably contemplated, that OSMOTECH would disclose the aforesaid trade secrets, ideas, designs, methods, plans and technology set forth in paragraph 21 to complete the aforesaid waterproofing project based upon the aforesaid false representations of SHOT.

56. SHOT intended and reasonably contemplated, that OSMOTECH would forego applying for said government funding in its own name based upon the aforesaid false representations of SHOT.

57. Using the aforesaid trade secrets, ideas, designs, methods, plans and technology set forth in paragraph 21 provided by OSMOTECH to SHOT, and without the consent of OSMOTECH, written or otherwise, SHOT has applied for, and secured the aforesaid one million dollar government funding and thereby damaging OSMOTECH in the amount of one million dollars.

58. OSMOTECH has suffered special damages due to a lost opportunity in the amount of one million dollars, which damages were proximately caused by the false representations of SHOT.

**WHEREFORE,** Plaintiff prays that Judgment be entered in favor of Plaintiff and against Defendant; that Defendant be order to pay to Plaintiff the sum of one million dollars as and for special damages; that Defendant be ordered to pay to Plaintiff punitive damages as are fair and reasonable: that

21

Defendant be ordered to pay Plaintiffs attorney's fees and costs; and for such other and further orders as this Court deems just and proper.

## COUNT V
## VIOLATION OF MISSOURI UNIFORM TRADE SECRETS ACT

59. Plaintiff adopts and re-alleges Paragraphs 1 through 58 of this Petition as if fully set forth herein.

60. The information provided by OSMOTECH to SHOT were trade secrets within the meaning of the Missouri Uniform Trade Secrets Act (the "Act"), Missouri Revised Statutes, Section 417.450 et seq.

61. SHOT acquired OSMOTECH's trade secrets by improper means.

62. SHOT has violated the Act and is liable for the damages sustained by OSMOTECH.

63. SHOT's misappropriation was outrageous due to SHOT's evil motive and/or reckless indifference to the rights of Osmotech.

64. SHOT's misappropriation has caused Osmotech to incur special damages in the amount of one million dollars

**WHEREFORE,** Plaintiff prays that Judgment be entered in favor of Plaintiff and against Defendant; that Defendant be order to pay to Plaintiff the sum of one million dollars as and

22

for special damages; that Defendant be ordered to pay to Plaintiff punitive damages as are fair and reasonable: that Defendant be ordered to pay Plaintiffs attorney's fees and costs; and for such other and further orders as this Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Plaintiff, by counsel, respectfully requests that all issues set forth herein, which have a right to be tried by a jury be so tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief for all Counts above: For judgment against Defendant that Defendant has breached the NDA; For judgment against Defendant for damages in an amount to be proven at trial together with attorneys' fees and costs, for special damages in the amount of one million dollars, and punitive damages as are fair and reasonable; For judgment against Defendant that Defendant has misappropriated OSMOTECH's trade secrets and proprietary technology; For judgment against Defendant for fraud; For injunctive relief to the extent necessary to protect the rights and interests asserted by Plaintiff herein, including but not limited to an injunction preventing Defendant from persisting in its wrongful

23

and bad faith actions, and an injunction preventing Defendant from using Plaintiff's Proprietary Information; and for such other relief as the court deems just and appropriate.

Respectfully submitted,

GLEN GAMMILL                                    41641
Attorney for Plaintiff
2025 S. Brentwood Blvd., Ste. 10
St. Louis, MO 63144
(314) 968-6890
(314) 962-7778 Facsimile

## NON-DISCLOSURE AGREEMENT

This Agreement is entered into as of December 4, 2005 by and between Space Hardware Optimization Technology, Inc., having a place of business at 7200 Highway 150, Greenville, Indiana 47124 (hereinafter referred to as "SHOT, Inc."), and Osmotech, LLC, having a place of business at 17295 Chesterfield Airport Rd., Suite 200, Chesterfield, MO 63005 (Hereinafter referred to as "Osmotech").

### 1. PURPOSE

DRYTRONIC, INC

The purpose of this Agreement is to set forth the rights and obligations of the parties with respect to the use, handling, protection, and safeguarding of Proprietary Information which is disclosed by and between parties hereto relating to as strategic business plans, teaming opportunities and proprietary technologies hereinafter referred to as "Proprietary Information". "Recipient" or "receiving party" shall mean the party receiving the Proprietary Information and "Discloser" or "disclosing party" shall mean the party disclosing Proprietary Information in accordance with this Agreement.

### 2. DEFINITION

Proprietary Information is defined as technical data and other information (including, but not limited to, reports, descriptions, drawings, compositions, business and financial information, and computer software) in whatever form, which is related to the subject matter set forth in Article 1 hereabove, which is disclosed by one party to the other party in accordance with this Agreement.

### 3. TERM

This Agreement shall terminate sixty (60) months from the date specified in the introductory paragraph hereabove, however, this Agreement may be terminated by either party at any time by giving thirty (30) days written notice of termination to the other party. Notwithstanding any such termination, the requirements specified in Article 5 herebelow shall continue to be binding upon the parties thereafter for a term of ten years.

### 4. ACTIONS SEEKING DISCLOSURE OF PROPRIETARY INFORMATION.

In the event that Recipient or any of its officers, employees or consultants are requested or required (by court or administrative order, or by deposition, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process) to disclose any of the Proprietary Information, Recipient will provide the Discloser with prompt written notice of any such request or requirement so that Discloser may seek a protective order or other appropriate remedy to prohibit or limit such disclosure. If, in the absence of a protective order, Recipient or any of its officers, employees or consultants are nonetheless, in the written opinion of counsel, legally compelled to disclose Proprietary Information, Recipient or such officer, employee or consultant may, without liability hereunder, disclose such portion of the Proprietary Information which counsel advises is legally required to be disclosed. Recipient shall advise Discloser of the Proprietary Information disclosed and the person to whom it is disclosed, and, upon request of Discloser, shall provide Discloser with a copy of the legal opinion regarding the disclosure of such Proprietary Information.

### 5. LIMITATIONS ON USE AND DISCLOSURE OF PROPRIETARY INFORMATION

A. Proprietary Information disclosed by one party shall be used by the receiving party solely for the purpose of discussing and understanding associated systems development and shall not otherwise be used for the benefit of the Recipient or others.

B. Proprietary Information shall not be copied or reproduced by the receiving party without the express written permission of the disclosing party, except for such copies as may be reasonably required for accomplishment of the purpose stated above.

C. Proprietary Information shall be disclosed only to the director or employees of the receiving party who have a "need to know" in connection with the purpose stated above.



EXHIBIT

A

D. Except as permitted in Article 4 hereabove, Proprietary Information shall not be disclosed by receiving party to any third party without the prior written consent of the disclosing party.

E. This Agreement shall not restrict disclosure or use of Proprietary Information which:

  (1) was in the public domain at the time of disclosure or thereafter enters the public domain through no breach of this Agreement by the receiving party; or

  (2) was, at the time of receipt, otherwise known to the receiving party without restrictions as to use or disclosure and can be shown by written documentation; or

  (3) becomes known to the receiving party from a source other than the disclosing party without breach of this Agreement by the receiving party and can be shown by written documentation to have been received by the Recipient on a non-Proprietary basis, prior to receipt from the disclosing party, from a third party lawfully possessing and lawfully entitled to disclose such information; or

  (4) is developed independently by the receiving party without the use of Proprietary Information disclosed to it hereunder and can be shown by written documentation; or

  (5) is disclosed more than ten (10) years after it is first received hereunder.

## 6. DAMAGES; SPECIFIC PERFORMANCE.

Each Party hereby agrees and confirms that the subject matter of this Agreement is unique, and that it may be impossible to measure the damages, which would result to a Party from violations of the various agreements and covenants set forth herein. Accordingly, in addition to any other remedies which may be available under this Agreement or at law or in equity, each Party hereby agrees that the other Party shall have the right to have all obligations, undertakings, covenants and other provisions of this Agreement specifically performed and shall have the right to obtain preliminary and permanent injunctive relief to secure specific performance, and to prevent a breach or contemplated breach, of this Agreement.

## 7. WARRANTY

The Recipient acknowledges that none of the Discloser or its representatives and none of the respective officers, directors, employees, agents or controlling persons of such representatives makes any express or implied representation or warranty as to the accuracy or completeness of any Proprietary Information, and the Recipient agrees that none of such persons shall have any liability to it or any of its representatives relating to or arising from its or their use of any Proprietary Information. The Recipient also agrees that neither it nor its representatives are entitled to rely on the accuracy or completeness of any Proprietary Information and that it and they shall be entitled to rely solely on such representations and warranties regarding Proprietary Information as may be made to the Recipient in any final agreement between the parties and subject to the terms and conditions of such agreement.

## 8. NO FORMAL BUSINESS OBLIGATIONS

This Agreement shall not constitute, create, give effect to or otherwise imply a joint venture, pooling arrangement, partnership or formal business organization of any kind, nor shall it constitute, create, give effect to, or otherwise imply an obligation or commitment on the part of either party to submit a proposal to or perform a contract with the other party. Nothing herein shall be construed as providing for the sharing of profits or loss arising out of the efforts of either or both parties. This Agreement does not obligate or commit either party to proceed with any agreement, but is merely intended to protect certain information exchanged by the Parties. Neither party will be liable to the other for any of the costs associated with the other's efforts in connection with this Agreement.

## 9. NO LICENSE GRANTED; OWNERSHIP AND RETURN OF PROPRIETARY INFORMATION.



No license or conveyanc    ￬ any rights to either party under any discove    , inventions, patents, trade secrets, copyrights, or other form of intellectual property is granted or implied by the exchange of Proprietary Information between the parties. The Discloser grants to the Recipient no right, title or interest of any kind in any intellectual property contained in or relating to the Discloser's Proprietary Information. The Recipient agrees to make no claim to any such right, title or interest, however denominated. Upon request by the Discloser, the Recipient shall return all Proprietary Information in the possession of the Recipient or any of its Representatives to the Discloser without retaining any copies, summaries or extracts thereof.

## 10.    SPECIFIC PERSON TO RECEIVE PROPRIETARY INFORMATION

Each party shall advise the other party of one person in its employ who will receive the Proprietary Information exchanged pursuant to this Agreement. On the effective date of this Agreement the following are so named:

SHOT, Inc.
Mr. Mark S. Deuser
Telephone: (812) 923-9591
Facsimile: (812) 923-9598

Osmotech, LLC / DRYTRONIC, INC
Mr. Paul Femmer
Telephone: (636) 733 - 7570
Facsimile: (636) 733 - 7571

## 11.    UNITED STATES GOVERNMENT REGULATIONS

The parties and their employees shall not use or disclose any Proprietary Information or other Information furnished hereunder in any manner contrary to the laws and regulations of the United States of America, or any agency thereof, Including but not limited to, the Export Administration Regulations of the U.S. Department of Commerce, the International Traffic In Arms Regulations of the U.S. Department of State, and the Industrial Security Manual for Safeguarding classified Information of the Department of Defense.

## 12.    APPLICABLE LAW

This Agreement shall be construed by the laws of the State of Indiana, accepting its rules as to conflicts of laws.

## 13.    ASSIGNMENT

Neither this Agreement nor any interest herein may be assigned in whole or in part by either party hereto without the prior written consent of the other party.

## 14.    MISCELLANEOUS

For purposes of this Agreement, the term "person" shall be broadly interpreted to include, without limitation, any corporation, company, partnership, other entity or individual. This Agreement shall survive termination of any discussions between the Parties, the return or destruction of Confidential Information or any termination of any other agreement, whether in effect prior to or after the date of this Agreement. This Agreement shall not merge with, or be terminated or superseded by any future agreement between the Parties unless such agreement specifically so provides. If any provision hereof is unenforceable or invalid, it shall be given effect to the extent it may be enforceable or valid, and such unenforceability or invalidity shall not affect the enforceability or validity of any other provision of this Agreement. Any waiver of any of the terms hereof shall be enforceable only to the extent it is waived in writing signed by the Party against whom the waiver is sought to be enforced. Any waiver shall be only effective for the particular instance for which it is granted and shall not constitute a waiver of a subsequent occurrence of the waived event nor constitute a waiver of any other provision hereof, at the same time or subsequently. This Agreement supersedes any other agreements or undertakings, oral or written between the Parties respecting the subject matter hereof between the Parties. This Agreement may only be amended by an amendment signed by both Parties hereto. This Agreement is binding on the Parties and their successors.

Space Hardware Optimization Technology, Inc.

Signature: _____

Name: _____Mark S. Deuser_____

Title: _____President_____

Date: ___*November 29, 2005*___

Osmotech, LLC

Signature: _____

Name: ____Paul Femmer____

Title: ____President____

Date: ___December 5, 2005___

# BAKER & DANIELS LLP

EST. 1863

300 North Meridian Street, Suite 2700 • Indianapolis, Indiana 46204
Tel. 317.237.0300 • Fax 317.237.1000
www.bakerdaniels.com

BRENT D. TAYLOR
Attorney at Law
Direct 317.237.1282
brent.taylor@bakerd.com

INDIANA
WASHINGTON, D.C.
CHINA

March 14, 2007

By e-mail with copy by first-class United States mail

Mr. Paul Femmer
President
OsmoTech, LLC
17295 Chesterfield Airport Road
Suite 200
Chesterfield, MO 63005

> Re:   Your Allegations Against Space Hardware Optimization
>         Technology, Inc. ("SHOT")

Dear Mr. Femmer:

This law firm represents SHOT. We are writing in response to your letter to Jim Cherry at SHOT dated March 8, 2007 ("Your Letter") and your e-mail yesterday to Jim Cherry and Eric Taylor, in which you make allegations "that SHOT has misappropriated OsmoTech Proprietary Information to assist SHOT in its pursuit of patents, government contracts and congressional funding" and "of SHOT's misappropriation of Tech's [Louisiana Tech University's] Proprietary Information in violation of [SHOT's] Non-Disclosure Agreement with them [Tech]." In short, your allegations are false, defamatory, and an intentional interference with SHOT's contractual and prospective business relationships, and SHOT demands that you cease such conduct.

Baselessness. SHOT has never received any information from you, OsmoTech, LLC ("OsmoTech") or Drytronic, Inc. ("Drytronic") that is within the definition of "Proprietary Information" in Article 2 of the December 4, 2005 Non-Disclosure Agreement among SHOT, OsmoTech and Drytronic (the "NDA"). Consequently, SHOT has never been in the position to misappropriate OsmoTech's Proprietary Information, as you assert in Your Letter. Your claim that the "2007 Earmark was the product of a 'teaming opportunity'" and your reference to OsmoTech's "licensed technology" are not references to information that is or could be protected under the NDA. If you have specific items of information that you have transmitted to SHOT that you believe constitute Proprietary Information under the NDA, please immediately identify them in writing.

Nor has SHOT violated its agreements with Tech, and you have not identified any supposed violation. Again, if you have specific items of protected information that Tech has transmitted to SHOT that you contend are protected information under SHOT's agreements with

EXHIBIT

R

Mr. Paul Femmer
March 14, 2007
Page 2


Tech and that you believe SHOT has misused or misappropriated, please immediately identify them in writing.

Further, your e-mail claiming that SHOT has "filed a patent on [y]our power supply" is similarly misinformed. SHOT has not received any proprietary information from you, OsmoTech or Drytronic concerning any power supply you may have developed. In addition, SHOT's recent patent application makes no claims with respect to any power supply, so your e-mail is based on an erroneous assumption.

Defamation and tortious interference. SHOT is confident that you have no evidence to support your serious accusations of contractual violations and misappropriations, because there has been no violation or misappropriation. Thus, it was shocked to read not only the allegations, but your statement that you had "notified [Tech] of SHOT's misappropriation . . . in violation of your Non-Disclosure Agreement." Your follow-on statement that you "understand that [SHOT] will hear . . . shortly regarding [Tech's] formal disassociation from [SHOT's] contracting and funding activities" documents that you have intended your groundless accusations to cause SHOT to lose its valuable relationships and business opportunities and that you expect such injury to occur soon. SHOT also has information that you have made derogatory comments about SHOT to the Army Corps of Engineers. Such conduct renders you, OsmoTech and Drytronic jointly and severally liable for any losses sustained as a result of your defamation and tortious interference, as well as for punitive damages.

Demands. SHOT demands that you, OsmoTech and Drytronic immediately cease and desist (1) making or repeating such defamatory statements and (2) engaging in efforts to sabotage SHOT's business with Tech, the Army Corps of Engineers or any other entity or person. SHOT further demands that you, OsmoTech and Drytronic make all practicable efforts to mitigate the damages you have inflicted on SHOT, beginning with written retractions of (1) the defamatory allegations you acknowledge making to Tech and (2) the derogatory statements you have made about SHOT to the Army Corps of Engineers.

This letter is without prejudice to, and SHOT reserves, all of its rights and remedies under its various agreements and all applicable laws. We expect that you, OsmoTech and Drytronic will understand the seriousness of this matter and will comply immediately with the foregoing demands. Please direct any further communications on these matters to us.

Very truly, yours,

Brent D. Taylor

BDT/jd
cc:     John Vellinger
        Jim Cherry
        Eric Taylor


BDDB01 4698529v2

**BY LEAVE**

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, STATE OF MISSOURI
TWENTY-FIRST DIVISION
CIRCUIT COURT

OSMOTECH, LLC,                )
a Georgia limited             )
liability company,            )
          Plaintiff,          )
                              )
vs.                           )     CASE NO. 07CC-001373
                              )     Div.    11
                              )
SPACE HARDWARE OPTIMIZATION   )
TECHNOLOGY, INC.,             )
an Indiana corporation,       )
          Defendant.          )


**Jury Trial Demanded**


**FIRST AMENDED PETITION FOR BREACH OF CONTRACT; VIOLATION OF
MISSOURI UNIFORM TRADE SECRETS ACT; BREACH OF IMPLIED COVENANT
OF GOOD FAITH AND FAIR DEALING; FRAUD AND INJUNCTIVE RELIEF**

**NOW COMES Plaintiff, OSMOTECH, LLC,** a Georgia limited
liability company, by its counsel, and complaining of **Defendant,
SPACE HARDWARE OPTIMIZATION TECHNOLOGY, INC.,** an Indiana
corporation, states as follows:

1

## COUNT I
## BREACH OF CONTRACT

1.  Plaintiff, OSMOTECH, LLC ("OSMOTECH"), is a Georgia limited liability company, with its principal place of business at 17295 Chesterfield Airport Rd., Ste. 200, Chesterfield, Missouri.  OSMOTECH is engaged in the business of concrete waterproofing, restoration and protection.

2.  Defendant, SPACE HARDWARE OPTIMIZATION TECHNOLOGY, INC. ("SHOT") is an Indiana corporation engaged in the business of project design and production.  SHOT's principal place of business is located at 7200 Highway 150, Greenville, Indiana 47124.

3.  At all times relevant hereto, Paul Femmer ("Paul Femmer") has been the President of OSMOTECH.

4.  At all times relevant hereto, Mark S. Deuser ("Deuser") was the President of SHOT.

5.  At all times relevant hereto, Jim Cherry ("Cherry"), the Business Development Manager for SHOT, acted as an agent of SHOT.

6.  At all times relevant hereto, Eric Taylor ("Taylor"), Mechanical Engineer for SHOT, acted as an agent of SHOT.

7.  Plaintiff's principal place of business was located in St. Louis County Missouri at the time Plaintiff was first

2

injured by Defendant, and Venue is therefore proper pursuant to 508.010 R.S.Mo. 1994. Further, Defendant has had sufficient minimum contacts in the state of Missouri, and the County of St. Louis in that the agents of Defendant appeared in St. Louis County, Missouri, and received Proprietary Information which was protected by the Non-Disclosure Agreement as set forth hereinafter.

8.  On or about November 7, 2005, Jim Cherry contacted Femmer requesting a meeting in Greenville, IN to discuss SHOT's theoretical E-Seal electrophoretic surface treatment system ("E-Seal") and "the benefit that Osmotech can bring to the development of the hardware as well as the potential for OsmoTech in being able to utilize this technology to treat the variety of problems we have discussed with concrete and stone structures."

9.  OSMOTECH executed in its offices in St. Louis County the Non-Disclosure Agreement that SHOT had previously executed on November 29, 2005 and sent to OSMOTECH, with an effective date of December 4, 2005 (the "NDA"). A true and correct copy of the Non-Disclosure Agreement is attached hereto as Exhibit "A" and incorporated herein by this reference.

10. On or about December 5, 2005, Femmer, Erkki Lindberg (an Engineer for OSMOTECH), John Vellinger (Chief Operating

3

Officer and Vice President of SHOT), Paul Todd (Chief Scientist for SHOT), Cherry and Taylor met in the offices of SHOT in Greenville, IN for furtherance of the purposes set forth in paragraph 8 herein.

11. Section 1 of the NDA provides the purpose of the parties entering into the NDA and for the use, handling, protection and safeguarding of the Proprietary Information which is disclosed by and between the parties relating to strategic business plans, teaming opportunities and proprietary technologies.

12. Section 2 of the NDA defines "Proprietary Information" as technical data and other information (including, but not limited to, reports, descriptions, drawings, compositions, business, and financial information and computer software) in whatever form, which is related to strategic business plans, teaming opportunities and proprietary technologies of each party.

13. Section 5.A. of the NDA strictly limits the use and disclosure of Proprietary Information by either party for the purpose(s) of discussing and understanding associated systems development and shall not otherwise be used for the benefit of the receiving party.

4

14. Section 5.B. of the NDA further limits the use and disclosure of Proprietary Information from being copied or reproduced by the receiving party without the express written permission of the disclosing party.

15. Section 5.C. of the NDA further limits the use and disclosure of Proprietary Information only to the director or employees of the receiving party who have a "need to know" in connection with strategic business plans, teaming opportunities and proprietary technologies.

16. Between December 5, 2005 and December 31, 2006, Femmer, Cherry and Taylor personally met in St. Louis, Missouri; Mt. Vernon, Illinois; and Champaign, Illinois and between Femmer, Deuser, Cherry and Taylor and other officers of both companies in Greenville, Indiana for purposes of developing a teaming opportunity between OSMOTECH and SHOT.

17. On or about February 8, 2006 and unbeknownst to OSMOTECH, and without its prior written permission and in breach of the NDA, Eric Taylor and Paul Todd, acting on behalf of SHOT, filed a provisional patent application with the U.S. Patent and Trademark Office ("USPTO") for Electrophoresis Method and Device for Sealing and Strengthening Concrete and a Method for Its Testing, substantially utilizing Proprietary Information,

5

including trade secrets, that had been disclosed by OSMOTECH to SHOT.

18. On or about February 10, 2006, 2006 Cherry and Taylor met at the offices of OSMOTECH in St. Louis County, Missouri with Paul Femmer, who was the President of OSMOTECH, to inspect OsmoTech's proprietary devices, methods and trade secrets, and to continue further discussions under the NDA including SHOT's interest in utilizing proprietary technology and trade secrets of OSMOTECH as part of a teaming opportunity as provided for under the NDA. Mark Deuser was aware of the nature and purpose of that meeting.

19. Between December 5, 2005 and March 5, 2007, the parties have had numerous conversations, correspondence and e-mails concerning various teaming opportunities between the parties.

20. Consistent with the prior representations and believing the discussions to be confidential and part of SHOT's due diligence prior to making a teaming opportunity offer, Femmer provided Cherry, Taylor, and Deuser with information about OSMOTECH's confidential trade secrets and proprietary technology during these numerous conversations, correspondence and e-mails.

6

21. As part of this teaming opportunity and subject to the NDA, OSMOTECH disclosed Proprietary Information, which included certain trade secrets of OSMOTECH and information concerning its proprietary technologies which included (but is not limited to) the following:

(a) **OSMOTECH's Power Supply** - OSMOTECH disclosed that its electrophoretic system featured a synchronized, multi-applicator (separate applicators running concurrently off one power supply), programmable, polarity-reversing, pulsating, steel protecting, current controlling, voltage controlling, remotely monitored and controlled, commercial-grade DC power supply with multiple feedback circuits, which was specifically developed by OSMOTECH for concurrently treating thousands of square feet of concrete at one time more or less continuously and programmatically over the span of several days for automated deep particle applications such as strengthening, crack fusion, corrosion, alkali-silica reaction, and sulphate attack in bridges, roads, dams, piers, wharfs, runways, bunkers and other types of concrete infrastructure. SHOT disclosed that it was trying to design an E-Seal power supply for very superficial surface applications (e.g., very shallow surface sealing for water intrusion) in relatively modest structures, such as residential basements; using a single, small, sponge applicator,

similar in function to a "paint brush", that is hand-held in one place for a just a few minutes before being moved to the next treatment location;

(b) **OSMOTECH'S Perforated Electrode** – OSMOTECH disclosed that it had developed perforated electrodes for saturating and electrifying soils or other media directly underneath and/or behind concrete structures, and which are designed to be networked and synchronized so as to concurrently treat thousands of square feet of concrete at one time more or less continuously and programmatically over the span of several days for (i) extracting harmful chemicals such as chlorides or sulphates from concrete, (ii) to serve as opposing electrodes to the surface electrodes, and (iii) to provide particle treatments from below and/or behind concrete structures such as roads, retaining walls, slabs and bunkers.  SHOT disclosed that it was trying to design a small, sponge applicator (i) to be used by one person for very superficial surface applications (e.g., very shallow surface sealing for water intrusion) in relatively modest structures, such as residential basements; (ii) that is hard-shelled, inflexible, and similar in function to a "paint brush" that is hand-held in one place for just a few minutes before being moved to the next treatment location; and (iii) that was

8

borrowed from a multi-layered sponge applicator design invented by Dr. Henry Cardenas, PhD, of Louisiana Tech University.

(c) **OSMOTECH'S Inflatable Electrode Applicator** - OSMOTECH disclosed that it had developed lightweight, inflatable, fabric electrode applicators of multiple shapes and sizes which are designed to be (i) attached to any shape of concrete surface or structure (e.g., curved bridge columns and water tanks), and (ii) networked and synchronized with up to hundreds of other inflatable applicators so as to concurrently treat thousands of square feet of concrete at one time more or less continuously and programmatically over the span of several days for automated deep particle applications such as strengthening, crack fusion, corrosion, alkali-silica reaction and sulphate attack.    SHOT disclosed that it was trying to design a small, sponge applicator (i) to be used by one person for very superficial surface applications (e.g., very shallow surface sealing for water intrusion) in relatively modest structures, such as residential basements; (ii) that is hard-shelled, inflexible, and similar in function to a "paint brush" that is held in one place for just a few minutes before being moved to the next treatment location; and (iii) that was borrowed from a multi-layered sponge applicator design invented by Dr. Henry Cardenas, PhD, of Louisiana Tech University.

(d) **OSMOTECH'S Methods and Devices For Strengthening and Rehabilitation** - OSMOTECH disclosed that it had developed and/or licensed from Louisiana Tech University methods and devices for deep migration (up to several inches deep) of particles concurrently across thousands of square feet of concrete at one time more or less continuously over the span of several days to strengthen and rehabilitate damaged or otherwise low-performance concrete such as degraded bridge decks, locks and dams, seawalls, and bunkers. SHOT disclosed that it was trying to design only a device (not a method) for very superficial surface applications (e.g., very shallow surface sealing for water intrusion) in relatively modest structures, such as residential basements; using a single, small, sponge applicator, similar in function to a "paint brush", that is hand-held in one place for a just a few minutes before being moved to the next treatment location;

(e) **OSMOTECH'S Methods and Devices For Alkali-Silica Reaction ("ASR")** - OSMOTECH disclosed that it had developed methods and devices for deep migration (up to several feet deep) of particles concurrently across thousands of square feet of concrete at one time more or less continuously and programmatically over the span of several days to mitigate and prevent ASR expansion in structures such as roads, bridges and

10

dams. SHOT disclosed that it was trying to design only a device (not a method) for very superficial surface applications (e.g., very shallow surface sealing for water intrusion) in relatively modest structures, such as residential basements; using a single, small, sponge applicator, similar in function to a "paint brush", that is hand-held in one place for a just a few minutes before being moved to the next treatment location;

(f) **OSMOTECH'S Methods and Devices For Rebar Corrosion** – OSMOTECH disclosed that it had developed and/or licensed from Louisiana Tech University methods and devices for deep migration (up to several inches deep) of particles concurrently across thousands of square feet of concrete at one time more or less continuously and programmatically over the span of several days to (i) extract chlorides away from the rebar (using a proprietary form of electro-chemical chloride extraction); while (ii) simultaneously transporting and directing particles to where they are needed to create permeability and chemical barriers against chloride re-entry and corrosion of steel reinforcement in bridges and other steel reinforced structures. SHOT disclosed that it was trying to design only a device (not a method) for very superficial surface applications (e.g., very shallow surface sealing for water intrusion) in relatively modest structures, such as residential basements; using a

11

single, small, sponge applicator, similar in function to a "paint brush", that is hand-held in one place for a just a few minutes before being moved to the next treatment location;

(g) **OSMOTECH'S Methods and Devices For Polymer Impregnation** – OSMOTECH disclosed that it and Louisiana Tech University had developed methods and devices for deep migration (up to several inches deep) and self-assembly of charged latex particles concurrently across thousands of square feet at one time more or less continuously and programmatically over the span of several days, and featuring OSMOTECH's patented Electro-Osmotic Pulse ("EOP") dewatering system to (i) pre-dry the concrete before treatment and (b) to cause polymer self-assembly after treatment. SHOT disclosed that it was trying to design only a device (not a method) for very superficial surface applications (e.g., very shallow surface sealing for water intrusion) in relatively modest structures, such as residential basements; using a single, small, sponge applicator, similar in function to a "paint brush", that is hand-held in one place for a just a few minutes before being moved to the next treatment location. However, SHOT did eventually disclose, several months after OSMOTECH'S initial polymer impregnation disclosure, that SHOT had previously "considered use of", or words to that effect,

12

polymer spheres for superficial surface treatments, but with no consideration whatsoever of OSMOTECH'S EOP dewatering process;

(h) **OSMOTECH'S Methods and Devices For Crack Repair** – OSMOTECH disclosed that it and Louisiana Tech University had developed methods and devices to monolithically fuse cracks, seams and joints by inserting a flexible "U"-shaped mesh electrode deep (at least one-half to two inches deep) along the inner walls of a crack, seam or joint; filling the crack, seam or joint with special grout admixtures; and drawing particles directly to the deeply embedded electrode mesh concurrently along the entire crack, seam or joint more or less continuously and programmatically over the span of several days. SHOT disclosed that it had previously overlooked or otherwise not considered the need for methods or devices to fuse cracks, seams or joints.

(i) **OSMOTECH'S Methods and Devices For One-Sided Applications** – OSMOTECH disclosed that it, Louisiana Tech University, and the US Army Corps of Engineers had developed methods and devices to cause deep migration (up to several inches deep) of particles into concrete from only one side of the structure based on a "caterpillar" process of alternating fields. SHOT disclosed that it had previously not considered

13

the need for methods or devices to treat structures from only one side.

22. SHOT has disclosed to third parties without the prior written consent of OSMOTECH and in breach of the NDA the proprietary technologies and trade secrets set forth in paragraph 21 disclosed by OSMTOECH to SHOT.

23. SHOT has taken OSMOTECH's Proprietary Information and trade secrets, without the prior written consent of OSMOTECH and in breach of the NDA, and has disclosed to third parties this information for purposes of obtaining governmental contracts, grants and funding for itself related to research and development utilizing OSMOTECH's proprietary technology and trade secrets.

24. SHOT has attempted to incorporate into and claim as its own proprietary technology, the proprietary technologies and trade secrets set forth in paragraph 21 disclosed by OSMTOECH to SHOT.

25. Although OSMOTECH reasonably believed that a teaming opportunity was forthcoming with SHOT, none was ever made.

26. On or about January 9, 2007, OSMOTECH learned that SHOT had utilized its contacts with OSMOTECH, and under the guise of a teaming opportunity with OSMOTECH, had been soliciting certain government agencies using this teaming

14

opportunity to obtain further government funding and contracts, knowing that (a) such a teaming opportunity had not been reached between the parties, and (b) that SHOT was seeking said government funding and contracts to redevelop technology that was already developed and owned by OSMOTECH as a proprietary technology or trade secret.

27. On or about March 9, 2007, SHOT, through its employees or agents, filed a patent application with the USPTO based, at least in part, on OSMOTECH's proprietary technology and trade secrets described in paragraph 21 above and disclosed to SHOT under the NDA.

28. On March 8, 2007, OSMOTECH advised SHOT in writing to cease and desist with the practices and disclosures set forth above. In a letter Dated March 14, 2007 from an attorney representing SHOT, a true and correct copy of such letter is attached hereto as Exhibit "B" and incorporated herein by this reference, SHOT has refused to comply with same and has advised OSMOTECH that "SHOT has never received any information from you, OsmoTech . . . that is within the definition of "Proprietary Information" in Article 2 of the December 4, 2005 Non-Disclosure Agreement. . . Consequently, SHOT has never been in the position to misappropriate OsmoTech's Proprietary Information, as you assert in Your Letter(.)"

15

29. SHOT breached the NDA to treat the information provided to it by OSMOTECH as confidential and not to use the information for any purposes other than discussing teaming opportunities between the parties.

30. SHOT is systematically using the information which it received on a confidential basis to unfairly compete with OSMOTECH and to destroy the good will and customer relationships that OSMOTECH has developed.

31. As a result of SHOT's use of OSMOTECH's confidential information, including Proprietary Information and trade secrets, OSMOTECH has been damaged in an amount in excess of $75,000.

**WHEREFORE**, Plaintiff prays that Judgment be entered in favor of Plaintiff OSMOTECH, LLC and against Defendant SPACE HARDWARE OPTIMIZATION TECHNOLOGY, INC., in an amount to be proven at trial.

## COUNT II
## REQUEST FOR INJUNCTIVE RELIEF

32. Plaintiff adopts and re-alleges Paragraphs 1 through 35 of this Petition as if fully set forth herein.

16

33. OSMOTECH has a proprietary interest in its confidential proprietary technologies, trade secrets and Proprietary Information. If SHOT is permitted to continue to use OSMOTECH's confidential information, OSMOTECH will continue to be damaged.

34. OSMOTECH has requested that SHOT cease and desist from using OSMOTECH's confidential information, but SHOT has failed or refused to do so.

35. OSMOTECH has suffered and will continue to suffer irreparable harm and injury as a result of SHOT's systematic use of OSMOTECH's confidential information.

36. OSMOTECH has a likelihood of success on the merits.

37. OSMOTECH has no adequate remedy at law.

38. The NDA provides that each party shall have the right to obtain preliminary and permanent injunctive relief to secure specific performance, and to prevent a breach or contemplated breach of the NDA.

**WHEREFORE,** Plaintiff prays that it be granted preliminary and permanent injunctive relief, enjoining Defendant from utilizing OSMOTECH's confidential information including its proprietary technology and trade secrets.

### COUNT III
### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

17

39. Plaintiff adopts and re-alleges Paragraphs 1 through 38 of this Petition as if fully set forth herein.

40. Defendant had a duty to exercise judgment conferred by the express terms of the above-referenced agreements in such a manner so as to not evade the spirit of the transaction or deny Plaintiff the expected benefit of the NDA.

41. Defendant breached that duty by engaging in bad faith and/or unfair dealing.

42. Plaintiff was thereby damaged.

**WHEREFORE**, Plaintiff prays judgment against Defendant in an amount which will be proved at trial, together with attorneys' fees, costs, and for such further relief as the Court shall deem just and proper.

## COUNT IV
## Fraud

43. Plaintiff adopts and re-alleges Paragraphs 1 through 42 of this Petition as if fully set forth herein.

44. After December 4, 2005, OSMOTECH disclosed to SHOT that OSMOTECH was seeking to waterproof, strengthen, and otherwise rehabilitate degraded U.S. Army ammunition bunkers , and that, in accordance with a request from Mr. Vince Hock of

18

the U.S. Army Corps of Engineers, OSMOTECH would be seeking a congressional earmark for federal funding to waterproof, strengthen and otherwise rehabilitate bunkers for the U.S. military using the technology set forth in paragraph 21.

45.   SHOT represented to OSMOTECH that they had a great deal of experience in drafting the documents necessary to obtain such government funding.

46.   SHOT represented to OSMOTECH that they would draft the necessary documents to apply for said government funding in the amount of one to four million dollars as a joint teaming opportunity involving both SHOT and OSMOTECH.

47.   SHOT represented to OSMOTECH that OSMOTECH would do the actual project using OSMOTECH's trade secrets, ideas, designs, methods, plans and technology set forth in paragraph 21, and that SHOT would manufacture the devices necessary for the project.

48.   Based on the material false representations of SHOT, and relying on said representations to be true, OSMOTECH disclosed to SHOT the trade secrets, ideas, designs, methods, plans and technology set forth in paragraph 21 to complete said waterproofing, strengthening and rehabilitation project for the purpose of obtaining said government funding.

19

49.   Said false representations of SHOT were material to OSMOTECH in that OSMOTECH would not have disclosed to SHOT its trade secrets, ideas, designs, methods, and plans to waterproof, strengthen and otherwise rehabilitate said structures using the technology set forth in paragraph 21 but for the false representations of SHOT.

50.   Based on the material false representations of SHOT, and relying on said representations to be true, OSMOTECH did not seek and/or apply for said government funding in its own name.

51.   Said false representations were material to OSMOTECH in that OSMOTECH would have applied for said government funding in its own name but for the false representations by SHOT.

52.   The aforesaid material representations made by SHOT to OSMOTECH were false, and defendant knew of their falsity.

53.   OSMOTECH did not know of the falsity of said material representations made by SHOT.

54.   OSMOTECH had the right to rely on said representations made by SHOT, inasmuch as said waterproofing, strengthening and rehabilitation project was based solely on the trade secrets, ideas, designs, methods, plans and technology of OSMOTECH set forth in paragraph 21, and disclosed to SHOT under the protection of the NDA.

20

55.   SHOT   intended   and   reasonably   contemplated,   that
OSMOTECH   would   disclose   the   aforesaid   trade   secrets,   ideas,
designs, methods, plans and technology set forth in paragraph 21
to complete the aforesaid waterproofing project based upon the
aforesaid false representations of SHOT.

56.   SHOT   intended   and   reasonably   contemplated,   that
OSMOTECH   would   forego   applying   for   said   government   funding   in
its own name based upon the aforesaid false representations of
SHOT.

57.   Using   the   aforesaid   trade   secrets,   ideas,   designs,
methods, plans and technology set forth in paragraph 21 provided
by OSMOTECH to SHOT, and without the consent of OSMOTECH,
written   or   otherwise,   SHOT   has   applied   for,   and   secured   the
aforesaid   one   million   dollar   government   funding   and   thereby
damaging OSMOTECH in the amount of one million dollars.

58.   OSMOTECH has suffered special damages due to a lost
opportunity in the amount of one million dollars, which damages
were proximately caused by the false representations of SHOT.

**WHEREFORE,**   Plaintiff   prays   that   Judgment   be   entered   in
favor of Plaintiff and against Defendant; that Defendant be
order to pay to Plaintiff the sum of one million dollars as and
for   special   damages;   that   Defendant   be   ordered   to   pay   to
Plaintiff   punitive   damages   as   are   fair   and   reasonable:   that

21

Defendant be ordered to pay Plaintiffs attorney's fees and costs; and for such other and further orders as this Court deems just and proper.

## COUNT V
### VIOLATION OF MISSOURI UNIFORM TRADE SECRETS ACT

59. Plaintiff adopts and re-alleges Paragraphs 1 through 58 of this Petition as if fully set forth herein.

60. The information provided by OSMOTECH to SHOT were trade secrets within the meaning of the Missouri Uniform Trade Secrets Act (the "Act"), Missouri Revised Statutes, Section 417.450 et seq.

61. SHOT acquired OSMOTECH's trade secrets by improper means.

62. SHOT has violated the Act and is liable for the damages sustained by OSMOTECH.

63. SHOT's misappropriation was outrageous due to SHOT's evil motive and/or reckless indifference to the rights of Osmotech.

64. SHOT's misappropriation has caused Osmotech to incur special damages in the amount of one million dollars

**WHEREFORE,** Plaintiff prays that Judgment be entered in favor of Plaintiff and against Defendant; that Defendant be order to pay to Plaintiff the sum of one million dollars as and

22

for special damages; that Defendant be ordered to pay to Plaintiff punitive damages as are fair and reasonable: that Defendant be ordered to pay Plaintiffs attorney's fees and costs; and for such other and further orders as this Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Plaintiff, by counsel, respectfully requests that all issues set forth herein, which have a right to be tried by a jury be so tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief for all Counts above: For judgment against Defendant that Defendant has breached the NDA; For judgment against Defendant for damages in an amount to be proven at trial together with attorneys' fees and costs, for special damages in the amount of one million dollars, and punitive damages as are fair and reasonable; For judgment against Defendant that Defendant has misappropriated OSMOTECH's trade secrets and proprietary technology; For judgment against Defendant for fraud; For injunctive relief to the extent necessary to protect the rights and interests asserted by Plaintiff herein, including but not limited to an injunction preventing Defendant from persisting in its wrongful

23

and bad faith actions, and an injunction preventing Defendant from using Plaintiff's Proprietary Information; and for such other relief as the court deems just and appropriate.

Respectfully submitted,

GLEN GAMMILL                    #41641
Attorney for Plaintiff
2025 S. Brentwood Blvd., Ste. 10
St. Louis, MO 63144
(314) 968-6890
(314) 962-7778 Facsimile

## CERTIFICATE OF SERVICE

A copy of FIRST AMENDED PETITION FOR BREACH OF
CONTRACT; VIOLATION OF MISSOURI UNIFORM TRADE SECRETS ACT;
BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;
FRAUD AND INJUNCTIVE RELIEF was served upon Mark S. Deuser,
President SPACE HARDWARE OPTIMIZATION TECHNOLOGY, INC.7200
Highway 150, Greenville, Indiana 47124 by depositing same in
the U.S. Mail, postage prepaid, this 19th day of April, 2007.

GLEN GAMMILL

# NON-DISCLOSURE AGREEMENT

This Agreement is entered into as of December 4, 2005 by and between Space Hardware Optimization Technology, Inc., having a place of business at 7200 Highway 150, Greenville, Indiana 47124 (hereinafter referred to as "SHOT, Inc."), and Osmotech, LLC, having a place of business at 17295 Chesterfield Airport Rd., Suite 200, Chesterfield, MO 63005 (Hereinafter referred to as "Osmotech").

## 1. PURPOSE

The purpose of this Agreement is to set forth the rights and obligations of the parties with respect to the use, handling, protection, and safeguarding of Proprietary Information which is disclosed by and between parties hereto relating to as strategic business plans, teaming opportunities and proprietary technologies hereinafter referred to as "Proprietary Information". "Recipient" or "receiving party" shall mean the party receiving the Proprietary Information and "Discloser" or "disclosing party" shall mean the party disclosing Proprietary Information in accordance with this Agreement.

## 2. DEFINITION

Proprietary Information is defined as technical data and other information (including, but not limited to, reports, descriptions, drawings, compositions, business and financial information, and computer software) in whatever form, which is related to the subject matter set forth in Article 1 hereabove, which is disclosed by one party to the other party in accordance with this Agreement.

## 3. TERM

This Agreement shall terminate sixty (60) months from the date specified in the introductory paragraph hereabove, however, this Agreement may be terminated by either party at any time by giving thirty (30) days written notice of termination to the other party. Notwithstanding any such termination, the requirements specified in Article 5 herebelow shall continue to be binding upon the parties thereafter for a term of ten years.

## 4. ACTIONS SEEKING DISCLOSURE OF PROPRIETARY INFORMATION.

In the event that Recipient or any of its officers, employees or consultants are requested or required (by court or administrative order, or by deposition, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process) to disclose any of the Proprietary Information, Recipient will provide the Discloser with prompt written notice of any such request or requirement so that Discloser may seek a protective order or other appropriate remedy to prohibit or limit such disclosure. If, in the absence of a protective order, Recipient or any of its officers, employees or consultants are nonetheless, in the written opinion of counsel, legally compelled to disclose Proprietary Information, Recipient or such officer, employee or consultant may, without liability hereunder, disclose such portion of the Proprietary Information which counsel advises is legally required to be disclosed. Recipient shall advise Discloser of the Proprietary Information disclosed and the person to whom it is disclosed, and, upon request of Discloser, shall provide Discloser with a copy of the legal opinion regarding the disclosure of such Proprietary Information.

## 5. LIMITATIONS ON USE AND DISCLOSURE OF PROPRIETARY INFORMATION

A.  Proprietary Information disclosed by one party shall be used by the receiving party solely for the purpose of discussing and understanding associated systems development and shall not otherwise be used for the benefit of the Recipient or others.

B.  Proprietary Information shall not be copied or reproduced by the receiving party without the express written permission of the disclosing party, except for such copies as may be reasonably required for accomplishment of the purpose stated above.

C.  Proprietary Information shall be disclosed only to the director or employees of the receiving party who have a "need to know" in connection with the purpose stated above.

Page 1 of 4  SHOT®

**EXHIBIT**

A

D.   Except as permitted in Article 4 hereabove, Proprietary Information shall not be disclosed by receiving party to any third party without the prior written consent of the disclosing party.

E.   This Agreement shall not restrict disclosure or use of Proprietary Information which:

   (1)   was in the public domain at the time of disclosure or thereafter enters the public domain through no breach of this Agreement by the receiving party; or

   (2)   was, at the time of receipt, otherwise known to the receiving party without restrictions as to use or disclosure and can be shown by written documentation; or

   (3)   becomes known to the receiving party from a source other than the disclosing party without breach of this Agreement by the receiving party and can be shown by written documentation to have been received by the Recipient on a non-Proprietary basis, prior to receipt from the disclosing party, from a third party lawfully possessing and lawfully entitled to disclose such information; or

   (4)   is developed independently by the receiving party without the use of Proprietary Information disclosed to it hereunder and can be shown by written documentation; or

   (5)   is disclosed more than ten (10) years after it is first received hereunder.

## 6.   DAMAGES; SPECIFIC PERFORMANCE.

Each Party hereby agrees and confirms that the subject matter of this Agreement is unique, and that it may be impossible to measure the damages, which would result to a Party from violations of the various agreements and covenants set forth herein. Accordingly, in addition to any other remedies which may be available under this Agreement or at law or in equity, each Party hereby agrees that the other Party shall have the right to have all obligations, undertakings, covenants and other provisions of this Agreement specifically performed and shall have the right to obtain preliminary and permanent injunctive relief to secure specific performance, and to prevent a breach or contemplated breach, of this Agreement.

## 7.   WARRANTY

The Recipient acknowledges that none of the Discloser or its representatives and none of the respective officers, directors, employees, agents or controlling persons of such representatives makes any express or implied representation or warranty as to the accuracy or completeness of any Proprietary Information, and the Recipient agrees that none of such persons shall have any liability to it or any of its representatives relating to or arising from its or their use of any Proprietary Information. The Recipient also agrees that neither it nor its representatives are entitled to rely on the accuracy or completeness of any Proprietary Information and that it and they shall be entitled to rely solely on such representations and warranties regarding Proprietary Information as may be made to the Recipient in any final agreement between the parties and subject to the terms and conditions of such agreement.

## 8.   NO FORMAL BUSINESS OBLIGATIONS

This Agreement shall not constitute, create, give effect to or otherwise imply a joint venture, pooling arrangement, partnership or formal business organization of any kind, nor shall it constitute, create, give effect to, or otherwise imply an obligation or commitment on the part of either party to submit a proposal to or perform a contract with the other party. Nothing herein shall be construed as providing for the sharing of profits or loss arising out of the efforts of either or both parties. This Agreement does not obligate or commit either party to proceed with any agreement, but is merely intended to protect certain information exchanged by the Parties. Neither party will be liable to the other for any of the costs associated with the other's efforts in connection with this Agreement.

## 9.   NO LICENSE GRANTED; OWNERSHIP AND RETURN OF PROPRIETARY INFORMATION.

No license or conve_ .te of any rights to either party under any disc. les, inventions, patents, trade secrets, copyrights, or other form of intellectual property is granted or implied by the exchange of Proprietary Information between the parties. The Discloser grants to the Recipient no right, title or interest of any kind in any intellectual property contained in or relating to the Discloser's Proprietary Information. The Recipient agrees to make no claim to any such right, title or interest, however denominated. Upon request by the Discloser, the Recipient shall return all Proprietary Information in the possession of the Recipient or any of its Representatives to the Discloser without retaining any copies, summaries or extracts thereof.

## 10.    SPECIFIC PERSON TO RECEIVE PROPRIETARY INFORMATION

Each party shall advise the other party of one person in its employ who will receive the Proprietary Information exchanged pursuant to this Agreement. On the effective date of this Agreement the following are so named:

SHOT, Inc.                                    Osmotech, LLC / DRYTRONIC, INC
Mr. Mark S. Deuser                            Mr. Paul Femmer
Telephone: (812) 923-9591                     Telephone: (636) 733 - 7570
Facsimile: (812) 923-9598                     Facsimile: (636) 733 - 7571

## 11.    UNITED STATES GOVERNMENT REGULATIONS

The parties and their employees shall not use or disclose any Proprietary Information or other Information furnished hereunder in any manner contrary to the laws and regulations of the United States of America, or any agency thereof, Including but not limited to, the Export Administration Regulations of the U.S. Department of Commerce, the International Traffic In Arms Regulations of the U.S. Department of State, and the Industrial Security Manual for Safeguarding classified Information of the Department of Defense.

## 12.    APPLICABLE LAW

This Agreement shall be construed by the laws of the State of Indiana, accepting its rules as to conflicts of laws.

## 13.    ASSIGNMENT

Neither this Agreement nor any interest herein may be assigned in whole or in part by either party hereto without the prior written consent of the other party.

## 14.    MISCELLANEOUS

For purposes of this Agreement, the term "person" shall be broadly interpreted to include, without limitation, any corporation, company, partnership, other entity or individual. This Agreement shall survive termination of any discussions between the Parties, the return or destruction of Confidential Information or any termination of any other agreement, whether in effect prior to or after the date of this Agreement. This Agreement shall not merge with, or be terminated or superseded by any future agreement between the Parties unless such agreement specifically so provides. If any provision hereof is unenforceable or invalid, it shall be given effect to the extent it may be enforceable or valid, and such unenforceability or invalidity shall not affect the enforceability or validity of any other provision of this Agreement. Any waiver of any of the terms hereof shall be enforceable only to the extent it is waived in writing signed by the Party against whom the waiver is sought to be enforced. Any waiver shall be only effective for the particular instance for which it is granted and shall not constitute a waiver of a subsequent occurrence of the waived event nor constitute a waiver of any other provision hereof, at the same time or subsequently. This Agreement supersedes any other agreements or undertakings, oral or written between the Parties respecting the subject matter hereof between the Parties. This Agreement may only be amended by an amendment signed by both Parties hereto. This Agreement is binding on the Parties and their successors.

SHOT NDA 1 Femmer.doc  Rev. 1.0                    Page 3 of 4                    SHOT

Space Hardware Optimization Technology, Inc.

Signature: _____

Name: _____Mark S. Deuser_____

Title: _____President_____

Date: ___November 29, 2005___

Osmotech, LLC

Signature: _____

Name: _____Paul Femmer_____

Title: _____President_____

Date: ___December 5, 2005___

# BAKER & DANIELS LLP

EST. 1863

300 North Meridian Street, Suite 2700 • Indianapolis, Indiana 46204
Tel. 317.237.0300 • Fax 317.237.1000
www.bakerdaniels.com

BRENT D. TAYLOR
Attorney at Law
Direct 317.237.1282
brent.taylor@bakerd.com

INDIANA
WASHINGTON, D.C.
CHINA

March 14, 2007

By e-mail with copy by first-class United States mail

Mr. Paul Femmer
President
OsmoTech, LLC
17295 Chesterfield Airport Road
Suite 200
Chesterfield, MO 63005

> Re:   Your Allegations Against Space Hardware Optimization
> Technology, Inc. ("SHOT")

Dear Mr. Femmer:

This law firm represents SHOT. We are writing in response to your letter to Jim
Cherry at SHOT dated March 8, 2007 ("Your Letter") and your e-mail yesterday to Jim Cherry and
Eric Taylor, in which you make allegations "that SHOT has misappropriated OsmoTech Proprietary
Information to assist SHOT in its pursuit of patents, government contracts and congressional
funding" and "of SHOT's misappropriation of Tech's [Louisiana Tech University's] Proprietary
Information in violation of [SHOT's] Non-Disclosure Agreement with them [Tech]." In short, your
allegations are false, defamatory, and an intentional interference with SHOT's contractual and
prospective business relationships, and SHOT demands that you cease such conduct.

Baselessness. SHOT has never received any information from you, OsmoTech, LLC
("OsmoTech") or Drytronic, Inc. ("Drytronic") that is within the definition of "Proprietary
Information" in Article 2 of the December 4, 2005 Non-Disclosure Agreement among SHOT,
OsmoTech and Drytronic (the "NDA"). Consequently, SHOT has never been in the position to
misappropriate OsmoTech's Proprietary Information, as you assert in Your Letter. Your claim that
the "2007 Earmark was the product of a 'teaming opportunity'" and your reference to OsmoTech's
"licensed technology" are not references to information that is or could be protected under the NDA.
If you have specific items of information that you have transmitted to SHOT that you believe
constitute Proprietary Information under the NDA, please immediately identify them in writing.

Nor has SHOT violated its agreements with Tech, and you have not identified any
supposed violation. Again, if you have specific items of protected information that Tech has
transmitted to SHOT that you contend are protected information under SHOT's agreements with



EXHIBIT
R

Mr. Paul Femmer
March 14, 2007
Page 2


Tech and that you believe SHOT has misused or misappropriated, please immediately identify them
in writing.

Further, your e-mail claiming that SHOT has "filed a patent on [y]our power supply"
is similarly misinformed. SHOT has not received any proprietary information from you, OsmoTech
or Drytronic concerning any power supply you may have developed. In addition, SHOT's recent
patent application makes no claims with respect to any power supply, so your e-mail is based on an
erroneous assumption.

Defamation and tortious interference. SHOT is confident that you have no evidence
to support your serious accusations of contractual violations and misappropriations, because there has
been no violation or misappropriation. Thus, it was shocked to read not only the allegations, but
your statement that you had "notified [Tech] of SHOT's misappropriation . . . in violation of your
Non-Disclosure Agreement." Your follow-on statement that you "understand that [SHOT] will hear .
. . shortly regarding [Tech's] formal disassociation from [SHOT's] contracting and funding activities"
documents that you have intended your groundless accusations to cause SHOT to lose its valuable
relationships and business opportunities and that you expect such injury to occur soon. SHOT also
has information that you have made derogatory comments about SHOT to the Army Corps of
Engineers. Such conduct renders you, OsmoTech and Drytronic jointly and severally liable for any
losses sustained as a result of your defamation and tortious interference, as well as for punitive
damages.

Demands. SHOT demands that you, OsmoTech and Drytronic immediately cease
and desist (1) making or repeating such defamatory statements and (2) engaging in efforts to
sabotage SHOT's business with Tech, the Army Corps of Engineers or any other entity or person.
SHOT further demands that you, OsmoTech and Drytronic make all practicable efforts to mitigate
the damages you have inflicted on SHOT, beginning with written retractions of (1) the defamatory
allegations you acknowledge making to Tech and (2) the derogatory statements you have made about
SHOT to the Army Corps of Engineers.

This letter is without prejudice to, and SHOT reserves, all of its rights and remedies
under its various agreements and all applicable laws. We expect that you, OsmoTech and Drytronic
will understand the seriousness of this matter and will comply immediately with the foregoing
demands. Please direct any further communications on these matters to us.

Very truly yours,

Brent D. Taylor


BDT/jd
cc:     John Vellinger
        Jim Cherry
        Eric Taylor